F I L E D
Clerk
District Court

MAY 2 6 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 1:15-CR-00017 |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION DENYING** |
| | **DEFENDANT'S MOTION TO SUPPRESS** |
| **JORDAN M. JUCUTAN**, | |
| Defendant. | |

## I.   INTRODUCTION

On May 16, 2016, after a two-day evidentiary hearing held on May 11 and 12, the Court issued an order (ECF No. 76) denying Defendant's Motion to Suppress Confession and All Prior Statements Made on or About March 5, 201[5] (Motion, ECF No. 35) and indicated that a memorandum explaining the Court's findings and conclusions would follow. This is that memorandum.

Defendant Jordan M. Jucutan made oral statements to federal law enforcement officers at an interview at the Saipan office of the Federal Bureau of Investigation (FBI) on March 5, 2015, and made a written statement after a polygraph examination at the FBI office on March 31, 2015. In the United States' Response to Defendant's Motion (Response, ECF No. 61), the Government asserted that at the initial March 5 interview Defendant did not make any inculpatory statements. Because of that position, Defendant, in his Reply (ECF No. 67), withdrew the request to suppress statements made on March 5. At the hearing, however, the Government revised its position. It represented that while Defendant did not confess to any crimes on March 5, he did make statements that the Government intended to use against him at trial. For that reason, the Court deems the Motion with respect to the March 5 statements not to have been properly withdrawn, and decides whether statements on both March 5 and March 31 must be suppressed.

The Court notes that while the hearing was held at the U.S. District Courthouse in Saipan, the undersigned presided via telephone from his residence in Idaho. The Government's three witnesses likewise appeared telephonically, pursuant to the parties' stipulation (May 6, 2016, ECF No. 59). This arrangement was necessary in order to have the motion heard and decided sufficiently in advance of the May 17 trial to be of assistance to the parties in their trial preparation. The defense witnesses testified in person in the Saipan courtroom. Defendant did not object to the undersigned's receiving their testimony by telephone.

## II.   FACTS

The Court finds the following facts based on sworn testimony and exhibits admitted at the evidentiary hearing.

The United States Army Criminal Investigation Command was investigating possible fraud in the recruitment of individuals for the Army Reserve from 2005 to 2009. The Army Reserve Recruiting Assistance Program (AR-RAP) trained soldiers as "recruiting assistants" (RAs) to help identify others who had an interest in military service and to encourage them to enlist. An RA would earn $1,000 for every "nominee" who enlisted, and another $1,000 if the nominee actually shipped out.

A.   <u>March 5 Statements</u>

On March 5, 2015, Army Special Agent Joshua Kimrey and FBI Special Agent Joseph Strantz went to Dandan Middle School in Saipan to contact Jordan Jucutan, an eighth-grade teacher. They located him at the school and asked if he would come to the Saipan FBI office for an interview. Jucutan agreed. Later that day, he drove himself to the FBI office, accompanied by his wife and son. There, the agents told him that they were conducting an investigation involving AR-RAP and wanted to give him an opportunity to tell his side of the story. They told him he was

1  not under arrest and was free to leave at any time. They did not handcuff him. They did not advise

2  him of his constitutional rights.

3      The interview was conducted in a small conference room and was recorded on video. At

4  the start of the recording, Special Agent Kimrey notes the time as 4:06 p.m. Jucutan sat at one end

5  of a conference table. Kimrey sat at the side of the table to Jucutan's right, and Special Agent

6  Strantz sat at the side to his left. In the first few minutes of the interview, the agents asked Jucutan

7  for biographical information. Then Kimrey asked what Jucutan knew generally about AR-RAP

8  and Docupak, the private company that administered the program. At about this point in the

9  interview, Jucutan asked if he was in trouble. Kimrey responded that they were just "fact finders .

10  . . asking general questions." The questioning continued for a few minutes. At about the 18-minute

11  mark, Stantz asked Jucutan if he needed to leave soon, and Jucutan immediately and firmly

12  answered "No." Kimrey then showed Jucutan a chart with the names of nine persons Jucutan had

13  nominated. He questioned Jucutan about his relationship with those persons and the circumstances

14  of their recruitment, and confronted him directly with statements by some of the nine that they had

15  not been recruited by Jucutan and had not given him their personally identifiable information (such

16  as Social Security number) for use in nominating them.

17      Just before the 30-minute mark, after a discussion of Jucutan's bank accounts, the

18  following exchange took place:

19      Jucutan: "Am I [unintelligible]? You guys just tell me what's, what's the –"
        Kimrey: "Well, like I said –"

20

21      At exactly this point, in mid-sentence, the video cut out when the camera battery died. It is

22  not clear how long it took the agents to realize that the recording had stopped. There was a break

23  of about seven minutes. When the video resumed, Special Agent Shantz spoke:

24      Shantz: "OK, so the battery died, and we replugged it in – plugged it in with a

power cord. So where were we? We were talking about –"
Jucutan: "Oh, yeah. So, there's some instance where a recruiter can come in . . . "

The time that the interview resumed was not recorded. The interview continued for 17 more minutes, at the end of which Kimrey noted the time as 5:00 p.m.

At no point in the recorded interview did either agent raise his voice, become combative, or make threats. The tone throughout was conversational. Even when confronting Jucutan with incriminating evidence, the agents maintained their composure. The interview ended at about 5 p.m. Jucutan was allowed to leave and was not detained. He drove home with his wife and child. When she asked if he was in trouble, he told her the agents had told him he did not need a lawyer.

B.    March 31 Statements

After the initial interview on March 5, Jucutan volunteered to take a polygraph test. On March 25, Kimrey contacted Jucutan to confirm his availability on March 31 at 9:00 a.m. Jucutan drove himself to the FBI office. Shortly afterward, Kimrey arrived with the polygraph examiner, Army Special Agent Elizabeth Smith. Jucutan was searched before entering the interview room with Smith. Kimrey listened in on the interview from an adjacent room using a baby monitor. The interview was not recorded.

At 9:16 a.m., Special Agent Smith advised Jucutan of his Miranda rights by reviewing a written Rights Waiver/Non-Waiver Certificate with him. Jucutan signed the certificate indicating that "I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me." (Government Ex. F.) Agents Smith and Kimrey witnessed his signature. On the certificate, Jucutan initialed the time as 9:18 a.m. A few minutes later, he signed a statement acknowledging his consent to undergo a polygraph

4

1    examination in connection with larceny and conspiracy. (Government Ex. G.) The Statement of

2    Consent included his acknowledgment that the examination would be monitored through a two-

3    way mirror but not recorded; that questioning would take place before, during, and after the

4    instrument portion of the examination; that anything he said during the examination could be used

5    against him in judicial proceedings; that he had a right to talk privately with a lawyer and that he

6    could withdraw his consent at any time and the examination would stop.

7         Around 9:40 a.m., Smith went over Jucutan's personal information with him and explained

8    the components of the polygraph. Just before 10 a.m., she started to go over the facts of the case

9    with him. Around 10:30 a.m., she reviewed with him the questions she would be asking during the

10   instrument portion of the examination. Around 10:40 a.m., Smith and Jucutan took a ten-minute

11   break. After the break, Smith hooked up the polygraph apparatus to Jucutan and began

12   administering the instrument tests. The tests took about forty minutes.

13        At around 11:40 a.m., Smith presented Jucutan with the test results. In response, Jucutan

14   made incriminating admissions and began to cry. Just after 12 noon, he agreed to type a statement.

15   Smith exited and reentered the room twice while Jucutan was typing. Around 12:30 p.m., she

16   reviewed the typed one-paragraph statement with him and asked additional questions. Smith typed

17   out her questions and Jucutan's responses. They included this exchange:

18        Q: Is this statement that you made true?
          A: Yes.
19        Q: Why are you telling the truth now?
          A: Because I don't want to get into more trouble right now.
20        Q; Do you believe that by telling the truth you will be in less trouble?
          A: Yes. What you said "honesty is the best policy". I hope it does help.
21        Q: Did I give you the impression that you would not be punished today?
          A: No.
22        Q: Did I promise you anything to say the things you have said in this statement?
          A: No.
23        Q: Did I tell you that you would get in less trouble for saying the things you have said in
          this statement?
24

1   A: Kind of. You were saying "just tell the truth" "you are the little fish". I was thinking of being on the lower level and not escalating to the bigger one.

2   Q: Did you feel threatened or pressured to make the statement that you made today?
A: No.

3   (Sworn Statement, Government Ex. H.)

4   Also in the question-and-answer, Jucutan acknowledged that he was offered food and water

5   and allowed to take breaks. Jucutan signed the statement and initialed each page. The interview

6   concluded around 1:40 p.m. Jucutan was not formally arrested and was allowed to leave the FBI

7   office on his own.

8   **III.   DISCUSSION**

9   Under *Miranda v. Arizona,* 384 U.S. 436 (1966), statements a person makes in response to

10  questioning from law enforcement officers while the person is in custody are inadmissible at trial

11  if the person was not advised of his constitutional rights to remain silent and to have a lawyer

12  present. Even if a formal arrest has not occurred, one is considered to be in custody for purposes

13  of *Miranda* if a reasonable person would believe that he or she was not free to leave – that is, if

14  the circumstances surrounding the interrogation suggest "restraint on freedom of movement of the

15  degree associated with a formal arrest." *United States v. Kim,* 292 F.3d 969, 973 (9th Cir. 2002)

16  (quoting *Stansbury v. California,* 511 U.S. 318, 322 (1994)). The factors relevant to the custody

17  determination include: "(1) the language used to summon the individual; (2) the extent to which

18  the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

19  interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the

20  individual." *Kim,* 292 F.3d at 974 (citation omitted).

21  A.   March 5 Statements

22  There is no doubt that on March 5, 2015, Jucutan was not Mirandized and that he was

23  interrogated by law enforcement officers. The only issue is whether he was in custody.

24

As to the first *Kim* factor, no threatening language was used to summon Jucutan to the FBI office. Jucutan was allowed to finish work at the school that day before coming in for an interview. He voluntarily agreed to be interviewed.

As to the second factor, Jucutan was thoroughly confronted with evidence of his guilt, including witness statements and bank records. He was shown a chart that was color-coded to indicate those nominees who denied Jucutan recruited them, and the agents reviewed the evidence concerning each nominee. However, the tone was never aggressive, coercive, or deceptive. *Cf. United States v. Bassignani,* 575 F.3d 879, 884 (9th Cir. 2009) ("We have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone."). There was, however, some mild deception. Whenever Jucutan hesitated to continue talking and wondered aloud if he was in trouble, Kimrey assured him they were just fact finders gathering information. At the hearing, Stantz testified that they did not really need to speak with Jucutan – they just wanted to give him an opportunity to tell his side of the story – because they had plenty of evidence against him already.

The physical surroundings – the third *Kim* factor – did not suggest restraint consistent with custody. The FBI office where the interview took place is in a general office building, not a police station or federal building. The interview room looked like a general-purpose conference room, with a conference table, chairs, and video equipment. The room had a window, although the vertical blinds were drawn. The agents were dressed casually, in polo shirts, not in uniform, but were armed.

As to the fourth factor, the interview lasted a little over three-quarters of an hour. Although there is some dispute as to how long Jucutan was at the FBI office, under no account was he there longer than two hours, and more likely it was under an hour and a half.

1    As to the fifth factor, the degree of pressure to detain Jucutan was minimal. He was told he

2  was free to leave. Special Agent Stantz offered to accommodate Jucutan if the interview needed

3  to be cut short to fit Jucutan's schedule. Jucutan left freely.

4    From this review of the *Kim* factors as applied to the facts, the Court finds that the totality

5  of the circumstances does not suggest a restraint on Jucutan's freedom of movement consistent

6  with formal arrest. Jucutan was not in custody. Therefore, the federal agents had no obligation to

7  advise him of his Miranda rights.

8    Even if a person was not in custody when he answered questions from law enforcement,

9  his statements are inadmissible if they were not voluntarily made. "A confession is involuntary if

10  coerced either by physical intimidation or psychological pressure." *United States v. Haswood,* 350

11  F.3d 1024, 1027 (9th Cir. 2003). Deceptive police tactics may overcome a person's will if they

12  convey the false impression that the person's statements will not be used against him or charges

13  will not be brought. *See United States v. Preston,* 751 F.3d 1008, 1026–27. If the totality of the

14  circumstances overbore the person's will, the confession is coerced and must be excluded. *See*

15  *United States v. Crawford,* 372 F.3d 1048, 1060 (9th Cir. 2004).

16    The circumstances of the interview do not indicate any physical intimidation. Jucutan came

17  to and went from the FBI office on his own. He was never handcuffed or restrained. The federal

18  agents were armed but in street clothes. Special Agent Strantz offered to break off the interview if

19  Jucutan needed to leave.

20    Nor do the circumstances suggest psychological intimidation of the sort that would render

21  Jucutan's statements involuntary. Kimrey may have been shading the truth when he told Jucutan

22  that he and Stantz were just fact finders, whereas in actuality they already had built a case against

23  Jucutan through their interviews of his nominees. However, once the agents started confronting

24

him with nominees' specific incriminating statements, Jucutan could only have been deceiving himself if he did not realize he was in trouble. It has not been alleged that the agents fabricated or exaggerated any of the evidence with which they confronted Jucutan. They said nothing in the recorded interview to put pressure on Jucutan to confess.

Jucutan submitted a sworn statement that when the camera power went out, "SA Kimrey asked me if I had $17,000.00 now and if I could pay it at one time. SA Kimrey said it would be better if I paid it all now before things got more serious. I said I didn't have the money and that I didn't do anything but follow the RA guidelines that I was certified on." (Jucutan Decl. ¶ 34.) At the suppression hearing, Kimrey categorically denied the allegation, as did Shantz. Jucutan also took the stand at the hearing. On cross-examination, he conceded that in the recorded interview he asked if he had to pay back the money, and Kimrey responded that they were not there to collect. But he maintained that later, during the seven-minute break, Kimrey asked about the $17,000. On this point, the Court does not find Jucutan's testimony to be credible.

Jucutan testified that before the interview he asked the agents if he needed a lawyer and one of them told him he did not. Danica Jucutan, the defendant's wife, testified that her husband had told her the same thing right after the interview. The agents flatly denied telling Jucutan he did not need a lawyer. The Court finds the agents more credible on this point. Jucutan testified that before the interview started, the agents had not told him what their investigation was about or given him any reason for wanting to interview him. In his declaration and testimony, Jucutan portrayed himself as an unsuspecting former soldier who naively and completely trusted law enforcement officers. Yet at the same time, he asserts he had the presence of mind to ask for a lawyer before even knowing what the interview was about. The two mental states are not easily reconcilable. Perhaps, after the fact, he interpreted the agent's assurances that he was not in trouble to mean that

he did not need a lawyer. That is as far as the Court is prepared to believe.

For these reasons, the Court finds that Jucutan's statements on March 5 were voluntary. The March 5 statements, made while Jucutan was out of custody, are admissible at trial.

B. March 31 Statements

Jucutan asserts that his waiver of Miranda rights was invalid and that his March 31 confession was coerced.

A Miranda waiver is valid if it was knowing and intelligent, as shown by "the totality of the circumstances, including background, experience, and conduct of the defendant." *United States v. Bautista-Avila,* 6 F.3d 1360, 1365 (9th Cir. 1993) (quoting *United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir. 1986)).

Jucutan's version of events on March 31 is very different from that of the Government's witnesses. He stated, in his sworn declaration and on direct examination, that neither Special Agent Smith nor any other agent read him his Miranda rights; that Smith merely instructed him to mark certain boxes on consent forms; and that as a former soldier only recently discharged from the Army Reserve and used to following orders, he obeyed without knowing what he was agreeing to.

The Court does not find this testimony credible. Jucutan is a well-educated person, a college graduate, and a middle-school teacher. He was not under undue duress: he came to the interview voluntarily, on a date mutually agreed upon, and was not handcuffed. The agents were in street clothes and not obviously pulling rank. The amount of time taken over the advisement of rights, as recorded in contemporaneous notes by Special Agent Kimrey, is consistent with actually advising a person and not merely ordering him to sign at the bottom. Moreover, the written statement that Jucutan made at the end of the polygraph examination shows that he was not unreflectively saying and doing whatever the agents wanted (or whatever he thought the agents

wanted) him to say and do. When Smith asked him whether she told him he would get in less trouble if he confessed, he answered: "Kind of. You were saying 'just tell the truth' 'you are the little fish". I was thinking of being on the lower level and not escalating to the bigger one." This response indicates that even after hours of examination, Jucutan was able to resist reflexively and compliantly saying "No." He gave a nuanced answer that showed Special Agent Smith was encouraging him to be forthcoming with incriminating statements.

For these reasons, the Court finds that Jucutan was advised of his Miranda rights and that he knowingly and intelligently waived them. It is unnecessary to determine whether Jucutan was in custody during the March 31 questioning, for even if the interrogation was custodial, Jucutan was properly advised and consented to answer questions without advice of counsel.

Jucutan maintains that his March 31 written statement was involuntary, the product of unlawful coercion. In his declaration and hearing testimony, he stated that by the end of the polygraph test he felt confused and panicky and broke down sobbing. He stated that when left alone to write his statement, he got up several times and knocked on the door. Each time Special Agent Smith entered, she appeared quite agitated and yelled at him, telling him to write down that he stole and not accepting his protestations that he had done nothing wrong. According to Jucutan, the reason he put the word "stole" in quotation marks in his typed statement was to stage a protest – to comply with and be released by his interrogators without actually admitting to having stolen anything. He stated that he was not offered food or water. When he signed the statement, he was in a state of desperation, his mind was blank, and he did not understand what he was doing.

Jucutan may well have felt, subjectively, that he was under unbearable pressure to confess. But absent evidence that a person is particularly susceptible to psychological coercion, the test of whether police techniques were coercive is objective. *United States v. Huynh,* 60 F.3d 1386, 1387–

88 (9th Cir. 1995). There is no dispute that a prolonged polygraph examination is an uncomfortable experience; Special Agent Smith acknowledged as much on the stand. But Jucutan volunteered to undergo it, and Smith explained the procedure to him carefully before they began. Some of the circumstances that Jucutan testified to were directly disputed by the agents. For example, Special Agent Kimrey recalled specifically that he brought bottled water with him to the interview from his hotel, and gave bottles to both Jucutan and Smith. The Court finds that testimony credible. Smith denied raising her voice at Jucutan, and Kimrey testified that he never heard her yell at him. When Jucutan's attorney asked him what he meant by yelling, he said it was like his mom used to yell at him when she told him what to do. Even if Special Agent Smith's tone wasn't always as amiable as she recalls it to have been, this hardly rises to the level of undue psychological pressure.

As to the quotation marks around "stole," they are only significant if they indicate Jucutan was coerced to write the word. The full written statement suggests otherwise. In it, Jucutan describes in considerable detail how he stole the personally identifiable information of potential recruits. It is undisputed that Jucutan composed this statement and typed it himself, while Smith was outside the room. Jucutan may not have been ready to embrace the notion that what he did was "stealing." Perhaps he was adopting, in a limited way, a word suggested to him by Smith. But influence in word choice is not, by itself, evidence of coercion. *See United States v. Haswood,* 350 F.3d 1024, 1038 (9th Cir. 2003) (finding no coercion in making of written statement after polygraph examination). That does not mean he was coerced to relate the facts of his conduct. The Court finds that Jucutan's statement was voluntarily made.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion to suppress statements made on both March 5 and March 31.

1        The Clerk is directed to file this Memorandum Decision under seal, accessible only by the

2  parties, and to unseal it once the jury has returned a verdict and been discharged.

3        SO ORDERED: May 26, 2016

4

                                ALEX R. MUNSON

5                            Senior Judge