F I L E D
Clerk
District Court
SEP 10 2020
for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JORDAN M. JUCUTAN,<br><br>Defendant. | Case No. 1:15-cr-00017<br><br>**ORDER GRANTING DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE** |

Defendant Jordan Jucutan, an obese and asthmatic inmate at the Federal Correctional Institution in Sheridan, Oregon ("FCI Sheridan"), has filed an emergency motion for compassionate release due to COVID-19 (ECF No. 164.) Jucutan argues that confinement in a crowded prison environment heightens his risk of contracting COVID-19, which, given his underlying health conditions, is a dire threat. The Court set Jucutan's motion on an expedited briefing schedule (*see* Order, ECF No. 166.) The Government filed a prompt opposition (ECF No. 167), and Jucutan filed his reply (ECF No. 168.) The parties appeared for a motion hearing on September 10, 2020. Having considered the record, the parties' arguments, and the applicable law, the Court GRANTS Jucutan's motion and reduces his sentence to time served. As the Court will explain, the ongoing pandemic—grave as it is—does not entitle every federal inmate to immediate release. Nevertheless, the circumstances surrounding this case are exceptional.

**I.     Background**

At this point in time, the actions underpinning Jucutan's criminal conviction are

uncontested.[1] Between 2007 and 2009, Jucutan registered as a Recruiting Assistant (RA) for the United States Army Reserve on Saipan. As an RA, Jucutan was expected to actively recruit members of his community into the Army Reserve. For every soldier an RA personally recruited, the RA received a $1,000 reward. Jucutan, however, defrauded this system by claiming to have recruited four soldiers who in fact enlisted without his involvement.

On May 6, 2016, a federal grand jury indicted Jucutan on four counts of wire fraud in violation of 18 U.S.C. § 1343, and four counts aggravated identity theft in violation of 18 U.S.C. § 1028(a)(1)—one count of each per soldier. (Second Superseding Indictment, ECF No. 57.) A jury convicted Jucutan on all counts. (Verdict Form, ECF No. 103.)

The sentencing hearing was held on October 13, 2016. Even after having gone through a full trial in this case, the Government still moved for a downward departure from the sentencing guidelines. (Tr. 48:22–49:3.)[2] Speaking frankly, the prosecutor told the court that "this has been a very difficult case for me, personally." (Tr. 45:2–3.) He went on to say,

> We have an obligation as special prosecutors to apply the law objectively, and I tried to do that, in spite of my personal feelings towards Mr. Jucutan. He has always been respectful to me personally, and I think, to the community at large. . . . The Government has maintained since day one that this is not an individual who is, like, corrupt or evil to his core. Rather, that he is a good person, who made a bad mistake repeatedly over a short period of time. . . . I don't think he is an individual that needs to be rehabilitated. I don't think this is a crime that [he] will repeat.

(Tr. 45:7–47:2.) The Court granted the Government's motion for a downward departure (Tr. 52:25–53:2.) and sentenced Jucutan to a total term of 28 months in prison (Judgment at 2, ECF No. 113.) As the Court noted, this sentence was "the very minimum." (Tr. 56:21–22.)

The Court also granted Jucutan's unopposed motion to remain out of custody pending his

---

[1] The Court draws the following narrative from the second superseding indictment (ECF No. 57) and final presentence investigative report (PSR, ECF No. 115). A jury found the indictment's allegations true beyond a reasonable doubt (*see* Verdict Form, ECF No. 103), and neither party objected to the facts chronicled in the PSR. Moreover, Jucutan stated at his sentencing hearing that he accepted responsibility for his conduct. (Tr. 37:24–40:16, ECF No. 141.)
[2] "Tr." refers to the transcript of Jucutan's sentencing hearing, ECF No. 141.

appeal on statute-of-limitations grounds. (Order, ECF No. 126). Ultimately, the Ninth Circuit affirmed Jucutan's conviction on December 10, 2018, holding that the statute of limitations had not expired prior to his indictment. (Memo. of USCA, ECF No. 142.) That decision became final when the Supreme Court denied *certiori* and the Ninth Circuit's mandate issued on May 28, 2019. (Mandate, ECF No. 143). The Court thereafter ordered Jucutan to self-surrender to BOP to begin serving his 28-month sentence. (Order, ECF No. 149.) He reported to BOP on July 17, 2019. (ECF No. 163-2 at 2.)

What no one foresaw back then was the oncoming COVID-19 pandemic. BOP currently reports that five inmates have tested positive at FCI Sheridan where Jucutan is housed. *COVID-19*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sep. 10, 2020). And those are only the inmates that BOP is aware of. The actual number of infected is almost certainly greater.[3] Furthermore, as stated in a declaration attached to the Government's opposition, "[t]he situation changes daily and rapidly." (Decl. of Amanda Huston ¶ 8, ECF No. 167-3 at 3.)

The other critical change since 2016 is Jucutan's declining health. According to Jucutan's presentence investigative report, he had "no medical issues" and was healthy as of October 2016. (PSR ¶ 68, ECF No. 115.) Jucutan's attorney essentially stated the same in her sentencing memorandum. "Jordan has no medical condition warranting any need for care or treatment." (ECF No. 109 at 13.) Apparently, however, that is no longer true. A prison clinical report dated July 17, 2020 indicates that Jucutan suffers from "gradually worsening" shortness of breath caused by asthma and seasonal allergies. (Exhibit 5 at 48, ECF No. 163-29.) The treating physician further noted that Jucutan was "in pain" and "acutely ill." Three days later, Jucutan began using two

---

[3] At the September 10 motion hearing, the government informed the Court that BOP has tested less than half the inmates at FCI Sheridan. FCI Sheridan has 1,512 total inmates, 405 of which are at the Satellite Camp. https://www.bop.gov/locations/institutions/she/ (last visited Sep. 10, 2020.) As of September 4, 2020, BOP conducted 434 tests. (Govt's Ex. 3.)

prescription inhalers. (*Id.* at 61.) Jucutan has also gained body weight since his sentencing. Another clinical report dated July 20, 2020 notes that he has a body mass index of 38.3—greater than the obesity threshold of 30. (*Id.* at 43.) The Government, for its part, stipulates that Jucutan "is obese and likely has moderate-to-severe asthma." (Opposition at 1.) The Court also notes that Jucutan had a history of asthma as documented in two separate visits to the local hospital here on Saipan during his teenage years. (ECF No. 163-30 at 19, 21.)

Jucutan is scheduled for release on July 11, 2021 and is eligible for home detention as soon as April 18, 2021. (Sentence Monitoring Computation Data, ECF No. 163-2 at 2.) Therefore, he has less than eight months to serve of his 28-month sentence. His emergency motion argues that remaining in prison any longer will put his life in jeopardy, given the spread of COVID-19 at FCI Sheridan and his underlying conditions. Jucutan therefore asks the Court to reduce his sentence to time served so that he may shelter from the pandemic at his family's home in Lacey, Washington.

**II.     Legal Standard**

Generally, "[t]he court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). *See Dillon v. United States*, 560 U.S. 817, 824 (2010) ("A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances.") (cleaned up). The narrow exception is this: The Court may grant an inmate's motion to reduce the term of imprisonment, provided the inmate satisfy three conditions. § 3582(c)(1)(A). First, the inmate must exhaust all administrative remedies within BOP. § 3582(c)(1)(A). Second, the inmate must show that "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). Finally, the factors laid out in 18 U.S.C. § 3553(a) must support the inmate's motion. § 3582(c)(1)(A).

/

### III.     Discussion

*1. Exhaustion of Administrative Remedies*

The Government concedes that Jucutan exhausted his administrative remedies before filing the pending motion. (Opposition at 1.) This Court agrees. Under the statute, one way an inmate exhausts administrative remedies is by sending a letter requesting early release to the prison warden and waiting 30 days without a response. § 3582(c)(1)(A). On May 18, 2020, Jucutan's wife wrote a letter to FCI Sheridan's warden requesting his compassionate release due to COVID-19. (Letter, ECF No. 163-28.) The Postal Service delivered the letter on May 21. (Return Receipt, ECF No. 163-3.) According to Jucutan's motion, filed over three months later, the warden never responded to that letter. (Memo. at 15, ECF No. 163.) Consequently, Jucutan has exhausted his administrative remedies.[4]

*2. Extraordinary and Compelling Reasons*

To determine whether extraordinary and compelling reasons justify reducing an inmate's sentence, the Court must follow the "applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A). That policy statement, in turn, requires that: (1) the inmate "is not a danger to the safety of any other person or to the community" and (2) the inmate is facing one of four specified circumstances. U.S.S.G. § 1B1.13. The Government stipulates that Jucutan meets the first requirement, because he is clearly not a danger to anyone. (Opposition at 1.) Rather, the Government's opposition rests solely on the second requirement.

Looking to the four circumstances that satisfy the second requirement, one is relevant here.

---

[4] At the motion hearing, the government asked the Court to infer, without evidence, that BOP administratively considered whether to release Jucutan and ultimately decided against it. The government furthered asked the Court to give deference to this hypothetical administrative decision. The Court will not entertain that assumption. Because BOP never responded to Jucutan's letter requesting compassionate release, there is no administrative decision for the Court to review or give deference to.

That circumstance reads: "The [inmate] is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the [inmate] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."[5] § 1B1.13 cmt. n.1 (A).  In ordinary times, asthma and obesity would not be considered the kind of serious physical or medical condition described in the policy statement. However, COVID-19 changes that equation. The virus poses a particularly serious threat to individuals with underlying health conditions, particularly respiratory conditions like asthma. *People with Moderate to Severe Asthma*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Sep. 9, 2020). To compound that problem, "[p]risoners are exceptionally vulnerable to [COVID-19] infection due to the lack of distancing and hygiene issues endemic to prison life." *United States v. Moore*, No. 3:16-CR-00171-JO, 2020 WL 2572529, at *2 (D. Or. May 21, 2020). Given this reality, other district courts have already held that inmates at FCI Sheridan with underlying health conditions, including obesity and asthma, had a substantially diminished ability to provide self-care within the prison. *See id.*; *United States v. Bradley*, No. 2:14-CR-00293-KJM, 2020 WL 3802794, at *5 (E.D. Cal. July 7, 2020); *United States v. Morris*, No. CR99-0174-JCC, 2020 WL 4344945, at *2 (W.D. Wash. June 22, 2020).

As to Jucutan, the Court joins in that assessment. Jucutan's asthma is severe enough that he uses two inhalers, and his treating physician described him as acutely ill. Considering how

---

[5] The second circumstance is that the inmate is over 65 years old with age-related ailments, and the third circumstance is that the inmate must return home to care for a spouse or minor child. § 1B1.13 cmt. n.1 (B)–(C). Both are clearly inapplicable (Jucutan is 33 years old). The last circumstance is merely a catch-all provision that some other extraordinary and compelling reason exists. § 1B1.13 cmt. n.1 (D). The plain language of the policy statement requires the director of BOP to make that determination. *Id.* On the other hand, "a majority of federal district courts have found that . . . the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020). In this case, because the Court finds that the first circumstance applies, it declines to consider the catch-all provision.

6

infirm Jucutan's respiratory system already is, he must take particularly strenuous efforts to avoid contracting COVID-19. But that is likely impractical in a dense, institutional setting like FCI Sheridan. Consequently, the Court does not believe that Jucutan is able to provide adequate self-care within the environment of a correctional facility.

The Government offers several arguments against this conclusion. First, the Government misguidedly claims that Jucutan is not an inmate at FCI Sheridan because he is housed at its satellite camp. FCI Sheridan is made up of three facilities: the Federal Correctional Center (a medium security prison), the Federal Detention Center (which houses pretrial detainees), and the minimum-security Satellite Prison Camp (where Jucutan is housed). The Government contends that only the Correctional Center is called FCI Sheridan. Therefore, when BOP reported several positive cases at "FCI Sheridan," it was supposedly referring to inmates at the Correctional Center. According to the Government, no inmate at the Satellite Camp has tested positive. *See also* Govt's Ex. 3.) To highlight the distinct separation of the three parts, the Government produced at the September 10 motion hearing an aerial view of FCI Sheridan taken from Google Maps. (*See* Govt's Ex. 1.) Therefore, the Government argues that Jucutan will be safe from COVID-19 so long as he remains housed where he is.

To the extent semantics matter, Jucutan is an inmate at FCI Sheridan. BOP's own website describes FCI Sheridan as "a medium security federal correctional institution with an adjacent minimum security satellite camp and a detention center." *FCI Sheridan*, Bureau of Prisons, https://www.bop.gov/locations/institutions/she/, (last visited Sep. 9, 2020). Moreover, the warden of FCI Sheridan states that his duty is to "oversee the daily operations of the Federal Correctional Center, the Satellite Prison Camp, and the Federal Detention Center." (Decl. of Josias Salazar ¶ 2, ECF No. 167-1). Obviously, each facility is kept autonomous for some internal purposes.

Nevertheless, the three together constitute FCI Sheridan.

Indeed, the five positive cases that BOP reports at FCI Sheridan refers to the total inmate population, including the Satellite Camp. The Government may have been correct when it wrote in its opposition that none of FCI Sheridan's positive cases were at the Satellite Camp. Critically, however, when the Government filed that opposition on August 31, there were only two positive cases. Now there are three more. The fact that the number of positive cases more than doubled in just over a week indicates that the virus is actively spreading at FCI Sheridan. Even assuming all positive cases are still outside the Satellite Camp, that could change at any moment. After all, the facilities' populations are not isolated from each other. Jucutan himself works as a truck driver delivering food to the Correctional Center and Detention Center. Other inmates at the Satellite Camp also work at the other facilities. (Reply at 7.) The prison staff likewise move between each facility.

At the hearing, the Government argued that the precautions BOP has undertaken at FCI Sheridan is akin to the successful protocol implemented here by the Northern Mariana Islands Government. Since the initial stay-at-home order issued in March, 2020 and the first community-spread positive cases, the NMI has successfully prevented the spread of the virus by quarantining all incoming travelers at the airport and subjecting them to the COVID-19 tests. Similarly, at FCI Sheridan, the first two positive cases are from incoming inmates who were quarantined and subsequently tested. (Govt's Ex. 2.) The second two positive cases came from a U.S. Marshal move; both were quarantined upon arrival. The Government suspects the fifth case that was recently reported arrived in a similar manner and is subject to the same quarantine and testing procedure. The Court appreciates this analogy; however, it notes a very important detail. The Government does not dispute that the Camp inmates nevertheless make contact with the facilities' staff. There are 313 FCI Sheridan employees, and although none have tested positive as of August 17, 2020, not

all have "accepted opportunities to be tested"; only 195 staff have been tested. (Huston Declaration, ¶ 6, ECF No. 167-3 at 2.) Although BOP's screening and testing for COVID-19 protocols described by Health Services Administrator Huston are commendable, they do not adequately allay the real threat to Jucutan. (Huston Declaration, ¶ 9, ECF No. 167-3 at 3-7.) Accordingly, the Court does not find that housing Jucutan at the Satellite Camp is adequately protecting him against the risk of infection.

Lastly, the Government argues that Jucutan "is actually much safer now than he would be if released." (Opposition at 4.) The reason why, according to the Government, is that Thurston County, Washington—where Jucutan's family home is—has almost one thousand positive cases, whereas FCI Sheridan has far fewer positive cases (so far). (*Id.*) The Court, however, does not find that argument persuasive. It makes little sense to compare a prison in Oregon with a whole county in another state. Although Thurston County has more positive cases than FCI Sheridan, it is also a much larger geographic unit.

The Government has also downplayed the safety value of having greater control over one's day-to-day life. Even if Jucutan will be relocating to a county with many positive cases, he will nonetheless gain a newfound ability to self-quarantine indoors. In the long run, that may prove much safer than staying in his current environment. Whether or not FCI Sheridan is on the precipice of a larger outbreak is yet unknown. It is better to act while there is still time than to wait and see what happens next. *See Moore*, 2020 WL 2572529, at *2 (granting an inmate's motion for compassionate release from FCI Sheridan even before it reported its first positive case).

3. Section 3553(a) Factors

The seven factors under § 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the established sentencing range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any

victims. As it did at Jucutan's sentencing hearing, the Government again concedes that these factors weigh in Jucutan's favor. (Opposition at 1.) The Court sees no reason to disagree. Notably, it appears that Jucutan has maintained in prison the same positive character that the prosecutor described at his sentencing. Indeed, Jucutan's BOP progress report indicates that his behavior at FCI Sheridan is exemplary. (ECF No. 163-27.) Jucutan is not a violent offender or someone otherwise in need of rehabilitation. Furthermore, the fraud he committed involved a relatively small dollar amount committed over the span of years. There are many individuals the Court would not consider releasing into the community—pandemic notwithstanding—but Jucutan is not one of them.

## IV.     Conclusion

Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Court finds that extraordinary and compelling reasons warrant modifying Jucutan's prison sentence. Accordingly, the Court GRANTS Jucutan's motion and reduces his sentence to time served. The Court ORDERS BOP to release Jucutan within 48 hours. Additionally, the Court ORDERS Jucutan to home quarantine for at least 14 days after his release. All other terms of Jucutan's original sentence remain in effect, including the imposition of three years of supervised release.  (Judgment, ECF No. 113.)

IT IS SO ORDERED.

Dated this 10th day of September, 2020 in Saipan, Northern Mariana Islands.

_____
RAMONA V. MANGLONA
Chief Judge